UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| MICHAEL COLEMAN, | ) | |
|---|---|---|
| Plaintiff, | ) | No. 12 C 03842 |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| MARCUS HARDY et al., | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michael Coleman, an inmate at Stateville Correctional Center, filed this suit under 42 U.S.C. § 1983 against Dr. Parthasarathi Ghosh, Dr. Ronald Schaefer, Dr. Imhotep Carter, Latanya Williams, and Wexford Health Sources, Inc., alleging that the medical professionals violated his Eighth Amendment rights. *See* R. 60, First Am. Compl.[1] Coleman claims that the Defendants acted with deliberate indifference to his serious medical needs while treating his knee and back injuries, in violation of the Eight Amendment's prohibition against cruel and unusual punishment (as incorporated against state officers via the Fourteenth Amendment).

---

[1] This Court has subject matter jurisdiction under 28 U.S.C. § 1331. Coleman also brought a claim under § 1983 against S.A. Godinez, the Director of the Illinois Department of Corrections. *See* First Am. Compl. Godinez's motion to dismiss was granted earlier in the case, R. 78, and he remained in the case only in his official capacity for potential injunctive relief, if a deliberate-indifference violation was established. As this Opinion explains, the claim fails, so Godinez is now entitled to judgment against the injunctive-relief claim. For the purposes of this opinion and for convenience's sake, "Defendants" refers only to Wexford, Ghosh, Schaefer, Carter, and Williams (the movants on the summary-judgment claim).

Defendants now move for summary judgment. *See* R. 107, Defs.' Mot. Summ. J.[2] For the reasons discussed below, Defendants' motion is granted.

## I. Background

In deciding Defendants' motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Coleman is serving a sentence for a murder conviction in Stateville Correctional Center in Crest Hill, Illinois. Pl.'s Resp. DSOF ¶ 1. Wexford is the medical services provider for Stateville; it is responsible for hiring the professionals that provide medical services to Stateville inmates. *Id.* ¶ 6. The individual Defendants were all employed by Wexford and provided services at Stateville during the time that Coleman alleges he did not receive adequate care. *Id.* ¶¶ 2-5. Ms. Williams is a physician's assistant who still works at Stateville. *Id.* ¶ 3. Dr. Schaefer was a staff physician at Stateville from August 2010 to October 2011. *Id.* ¶ 4. Dr. Ghosh was the Medical Director at Stateville until he retired in March 2011. *Id.* ¶ 2. After Dr. Ghosh's retirement, Dr. Carter became the Stateville Medical Director. *Id.* ¶ 5. He served in that position until May 2012. *Id.*

In December 2010 (Coleman was already imprisoned by this time), Coleman had surgery at the University of Illinois at Chicago (UIC) to repair a tear in his meniscus. PSOF ¶ 1. To help prevent further injury to his knee, Coleman was given

---

[2]Citation to the docket is "R." followed by the entry number and, when necessary, the page/paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" (for Defendants' Statement of Facts) [R. 108]; "PSOF" (for Coleman's Statement of Additional Facts) [R. 113]; "Pl.'s Resp. DSOF" (for Coleman's response to Defendants' Statement of Facts) [R. 112]; and "Defs.' Resp. PSOF" (for Defendants' Response to Coleman's Statement of Additional Facts) [R. 118], followed by the paragraph number.

a medical permit that allowed him to be cuffed in front, rather than in back. *Id.* ¶ 4. In March 2011, Coleman injured his back after falling down stairs when cuffed from behind in violation of his medical permit. *Id.* ¶ 6. Coleman claims that he has suffered extreme pain in his knee and back and, despite writing numerous letters to Defendants asking for treatment, has not received adequate medical care for these conditions. *See* First Am. Compl. ¶¶ 50-120. Because Coleman alleges that each Defendant was deliberately indifferent to his medical condition, Coleman's interactions with each medical provider will be described in turn.

**A. Physician's Assistant Williams**

Williams first saw Coleman in December 2009, when he complained about pain in his knee. Pl.'s Resp. DSOF ¶ 10. She ordered x-rays and several treatments to reduce his pain. *Id.* She saw him again in March 2010, when he again complained of knee pain. *Id.* ¶ 12. She scheduled an appointment for Coleman to have his knee evaluated by the Medical Director. *Id.* Coleman did not go to the appointment with the Medical Director. *Id.*

Williams did not see Coleman again until March 25, 2011, after his knee surgery. *Id.* ¶ 27. At that appointment, Coleman complained that he had not yet received physical therapy and that he needed his medical permits renewed. *Id.* Williams followed up on Coleman's request for physical therapy and medical permits with Dr. Ghosh and the physical therapy department. *Id.* ¶¶ 27-28. In July 2011, Williams refilled Coleman's prescriptions and scheduled him for an appointment to see a medical provider, as requested by his physical therapist. *Id.*

¶¶ 37, 39. Williams last saw Coleman on March 13, 2012, when she performed his annual physical exam. *Id.* ¶ 49. Williams testified that Coleman did not complain about his knee or back pain during the physical. DSOF ¶ 49; R. 108-2, DSOF Exh. C, Williams Dep. at 66:7-67:2.³

## B. Schaefer

Before leaving Stateville in October 2011, Dr. Schaefer saw Coleman three times. Pl.'s Resp. DSOF ¶¶ 25, 34, 42. At Stateville, Dr. Schaefer worked at the asthma clinic, and primarily saw Coleman to treat his asthma condition and provide him with asthma medication. *Id.* Dr. Schaefer first saw Coleman on February 1, 2011 at the asthma clinic. *Id.* ¶ 25. Dr. Schaefer did not note in Coleman's medical records for that appointment that Coleman had complained of any knee pain. *Id.* Dr. Schaefer claims that it was his practice to chart any complaints of pain, so the absence of any record of a complaint means that Coleman did not complain about his pain. *Id.*; R. 108-2, DSOF Exh. D, Coleman Aff. ¶ 3.⁴ Dr. Schaefer next saw Coleman at the asthma clinic on June 13, 2011. Pl.'s Resp. DSOF ¶ 34. During that visit, Coleman complained of pain in his knee. *Id.* After explaining to Coleman that the asthma clinic was not the appropriate place to

---

³Coleman disputes that he did not complain about his pain during the physical examination. Pl.'s Resp. DSOF ¶ 49. He does not, however, provide any record citation to support his denial, not even an affidavit sworn-to by him. "[A] mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz*, 321 F.3d 680, 682 (7th Cir. 2003). DSOF ¶ 49 is therefore deemed admitted. *See id.* at 683. ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission.").

⁴Coleman again disputes without any record citation that he did not complain about his pain during his appointment with Dr. Schaefer. Pl.'s Resp. DSOF ¶ 25. DSOF ¶ 25 is therefore deemed admitted. *See Smith*, 321 F.3d at 682-83.

4

address his knee pain, Dr. Schaefer made an appointment for Coleman to be seen during sick call and prescribed him pain medication. *Id.* The last time Dr. Schaefer saw Coleman was September 29, 2011. *Id.* ¶ 42. Again, Dr. Schaefer did not chart any complaints of knee or back pain, suggesting that no such complaints were made. DSOF ¶ 42.[5]

### C. Dr. Ghosh

Dr. Ghosh was the Medical Director of Wexford until he retired on March 31, 2011. Pl.'s Resp. DSOF ¶ 5. His first interaction with Coleman related to knee pain was in April 2010, when Ghosh examined Coleman's knee in the Stateville health center. *Id.* ¶ 13. Based on this examination, he "ordered an MRI of the right knee, an orthopedic consultation at [UIC], a pair of crutches, low bunk, low galley, no leg iron, medical restraints, and Motrin 400 mg for two months." *Id.* The MRI results revealed a tear in Coleman's meniscus, and Ghosh ordered an orthopedic consult at UIC. *Id.* ¶ 15. Based on the recommendations of the consulting physician at UIC, Ghosh ordered x-rays, a follow-up with the UIC physician, and additional pain medication. *Id.* ¶ 17.

After Coleman's knee surgery, Ghosh admitted Coleman to the Stateville health center for observation. *Id.* ¶ 22. He examined Coleman and ordered several treatments, including crutches, low bunk, low galley, front-cuffing, and pain medication. *Id.* Coleman was discharged from the health center the next day with no complaints and minimal swelling. *Id.* Ghosh also approved the surgeon's

---

[5]Coleman disputes without any supporting record citation that he did not complain about his pain during his appointment with Dr. Schaefer. Pl.'s Resp. DSOF ¶ 42. DSOF ¶ 42 is therefore deemed admitted. *See Smith*, 321 F.3d at 682-83.

recommendations that Coleman receive physical therapy and follow-up appointments at UIC. *Id.* ¶ 20. Ghosh told the physical therapy department that Coleman should be put on the list to receive treatment. *Id.* Ghosh reiterated this directive to the physical therapy department in writing on January 4, 2011. *Id.* ¶ 24. A few days after his surgery, Coleman had a follow-up appointment at UIC during which he reported no right knee symptoms. *Id.* ¶ 23.

### D. Dr. Carter

Dr. Carter became the Medical Director of Wexford in July 2011. Pl.'s Resp. DSOF ¶ 5. Since that time, Carter has treated Coleman five times. *Id.* ¶¶ 40-41, 43, 45, 48. Carter first saw Coleman in August 2011 in the Stateville health center. *Id.* ¶ 40. During that visit, Coleman complained about pain in his knee. *Id.* After examining Coleman's knee, Carter ordered "repeat right knee radiology imaging, a right knee cortisone injection (to reduce any acute or chronic inflammation occurring in the knee), Naprosyn (for pain in his knee and back), and a follow-up appointment for 30 days." *Id.* Carter next saw Coleman when he administered the cortisone injection on September 29. *Id.* ¶ 41. Carter planned to follow up in three weeks to give Coleman another cortisone injection and to evaluate the treatment's effectiveness. *Id.* He also instructed Coleman to "increase physical activity as tolerated." *Id.* At the follow-up appointment on October 13, Coleman reported that he felt some improvement from the cortisone, but that he still had knee pain. *Id.* ¶ 43. To assess the source of this pain, Carter ordered a right-knee MRI, renewed

6

Coleman's medical permits, and scheduled a follow-up appointment. *Id.* Coleman received the MRI on December 13, 2011. *Id.* ¶ 44.

Carter's final interaction with Coleman was after the MRI results became available on December 21, 2013. *Id.* ¶ 45. Carter performed a knee examination and reviewed the MRI report. *Id.* Based on the examination and the MRI, Carter prescribed Coleman a stronger pain medication and ordered that Coleman receive another round of physical therapy. *Id.* Coleman later asked to stop using the stronger pain medication, and he was prescribed Ibuprofen instead. *Id.*

### E. Physical Therapy

Coleman also alleges that he did not receive physical therapy in a timely fashion. R. 111, Pl.'s Resp. Br. at 8. Coleman's surgeon recommended that Coleman receive physical therapy after his surgery. PSOF ¶ 2; Defs.' Resp. PSOF ¶ 2. Although he did receive medical treatment between December 2010 and May 2011, Pl.'s Resp. DSOF ¶¶ 10-30, Coleman did not receive physical therapy until May 26, 2011, PSOF ¶ 7. When Coleman was eventually able to see the physical therapist, he did not want to complete the physical therapy treatment because of pain in his knee and back that occurred when he fell down some stairs. PSOF ¶ 6; Pl.'s Resp. DSOF ¶¶ 31, 33, 35-36, 38.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only competent evidence of a type otherwise admissible at trial, *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

#### A. Individual Defendants

Coleman alleges that Dr. Ghosh, Dr. Schaefer, Dr. Carter, and Ms. Williams acted with deliberate indifference to his medical needs in violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976) (holding that deliberate indifference to the serious medical needs of a prisoner may serve as the basis for a § 1983 claim). To prove a claim of deliberate indifference to serious medical need, Coleman must show (1) an objectively serious medical condition; (2)

8

that Defendants knew of the condition and were deliberately indifferent in treating Coleman; and (3) this indifference caused Coleman some injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Defendants argue that Coleman cannot meet the second element (the subjective state-of-mind requirement) because none of the Defendants were deliberately indifferent to his medical condition. *See* R. 109, Defs.' Br. at 2-18.

The deliberate-indifference inquiry has two components. "The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk." *Gayton*, 593 F.3d at 620. Even if an official is aware of the risk to the inmate's health, "he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)). Negligence cannot support a claim of deliberate indifference; nor is medical malpractice a constitutional violation. *Estelle*, 429 U.S. at 105-06; *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011); *Barry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). The official must act with "a sufficiently culpable state of mind." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). "Deliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Gayton*, 593 F.3d at 622-23; *see also Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). Thus, a medical professional's treatment decisions will be accorded

9

deference "unless no minimally competent professional would have so responded under those circumstances." *Jackson*, 541 F.3d at 697.

Coleman has failed to present evidence that the individual Defendants were deliberately indifferent to his medical needs. In their statement of facts, Defendants set out in great detail the medical care that Coleman received at Stateville. *See* DSOF ¶¶ 10, 12-13, 15, 17, 20, 22-25, 27-28, 34, 37, 39-43, 45, 48-49. Coleman admits that Williams, Dr. Schaefer, Dr. Ghosh, and Dr. Carter provided him with some form of treatment for his pain or followed-up on existing treatment almost every time they saw him. Pl.'s Resp. DSOF ¶¶ 10, 13, 15, 17, 22, 34, 37, 40-41, 43, 45, 48 (admitting that Defendants provided him with various forms of treatment); *see also id.* ¶¶ 12, 20, 24, 27-28, 39 (admitting that Defendants referred Coleman to treatment or checked on the status of his treatments). At various times, Coleman received pain medication from multiple sources, x-rays, MRIs, cortisone injections, crutches, and several other forms of treatment. *Id.* ¶¶ 10, 13, 15, 17, 22, 34, 37, 40-41, 43, 45, 48. To establish that the care he received from these Defendants constituted deliberate indifference, Coleman must meet the high burden of showing that the treatment was "a substantial departure from accepted professional judgment" or that "no minimally competent professional" would have responded to Coleman's complaints as the Defendants did. *Gayton*, 593 F.3d at 622-23; *Jackson*, 541 F.3d at 697. Coleman presents no such evidence.

When the Defendants examined Coleman but did not provide him with any treatment for his knee or back pain, each Defendant claims that it was because

10

Coleman did not complain of any pain during the examination. DSOF ¶¶ 25, 42, 49. Defendants support these claims with Coleman's medical records, which do not contain any notes that Coleman complained of knee or back pain, along with Defendants' testimony that it was their typical practice to chart any patient complaints. *Id.* Coleman presents no evidence to rebut these claims—not even his own affidavit. In response to Dr. Schaefer's statements that Coleman did not complain of knee or back pain during his February 2011 and October 2011 visits to the asthma clinic, Coleman baldly denies that he did not complain about his pain. Pl.'s Resp. DSOF ¶¶ 25, 42. He provides no record citations for these assertions (again, not even his own affidavit), and his denials flatly contradict his own deposition testimony that he does not remember these visits to Schaefer at all. *See* R. 108-1, DSOF Exh. A, Coleman Dep. at 55:23-57:24; 100:19-101:17. Coleman also fails to cite any record evidence to support his denial of Williams's statement that Coleman did not complain about pain during his March 2012 physical. Pl.'s Resp. DSOF ¶ 49. Coleman's unsupported denials (again, not even an affidavit is offered in support) do not create a genuine issue of material fact as to whether he was properly treated on these three occasions. *See Anderson*, 477 U.S. at 256 ("The plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."); *see also Lucas v. Chicago Transit Authority*, 367 F.3d 714, 726 (7th Cir. 2004) ("[C]onclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment.").

Coleman also alleges that he sent Defendants several letters complaining of his pain and requesting medical treatment. *See* Pl.'s Resp. Br. at 11-12. Defendants presented evidence, however, that these letters were screened by IDOC personnel, and that Defendants would not have received (and, indeed, did not receive) Coleman's complaints. DSOF ¶ 70 (citing depositions and affidavits of Wexford medical professionals). Coleman's evidence that he sent letters does not create a genuine issue of material fact. *See Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013). Coleman provides no additional evidence tending to show that the Defendants read the letters, and his statement that he sent the letters can comfortably coexist with Defendants' statement that they would not have received them based on IDOC policy. *Id.*

Even if the Defendants had received the letters addressed to them, Coleman presents no evidence that the care that Defendants provided was so far below professional standards as to support an inference of a culpable state of mind. In evaluating a claim of deliberate indifference, the Court must look to the "totality of an inmate's medical care." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 591 (7th Cir. 1999) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997)). Again, Coleman has presented no evidence that the treatment he received from the individual Defendants was so inadequate that it rose to the level of deliberate indifference. In fact, Coleman even admits that "there was never a time where any of the Wexford medical providers or Wexford itself withheld medical

treatment from the plaintiff that he/she/it/they knew he required." Pl.'s Resp. DSOF ¶ 68. Coleman admits that he asked for and received treatment on several occasions, and he fails to present a genuine issue of fact that the individual Defendants ever denied him treatment that he asked for. Based on the undisputed facts, no reasonable juror would conclude that Williams, Dr. Schaefer, Dr. Ghosh, or Dr. Carter were deliberately indifferent to Coleman's medical need. Therefore, the motion for summary judgment is granted for the individual Defendants.

### B. Wexford

Coleman also alleges that Wexford acted with deliberate indifference to his knee and back pain. *See* First Am. Compl. To hold Wexford liable under § 1983, Coleman must demonstrate that "a constitutional deprivation occurred as the result of an express policy or custom promulgated by that entity or an individual with policymaking authority." *Gayton*, 593 F.3d at 622. This requires that Coleman show that the official policy was "the *cause* of the alleged constitutional violation—the moving force behind it." *Greiveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008) (internal quotation marks and citation omitted). "If a plaintiff cannot identify any formal policy that is unconstitutional, the plaintiff may show deliberate indifference through 'a series of bad acts' creating an inference that [Wexford] officials were aware of and condoned the misconduct of [its] employees." *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (citation omitted). Again, there must be a "'direct causal link' . . . between [Wexford's] deviation from its established policy" and Coleman's injury." *Woodward v. Correctional Med. Servs. of Illinois, Inc.*, 368 F.3d

917, 928 (7th Cir. 2004) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997)).

Coleman does not present sufficient admissible evidence to demonstrate that any express policy or "series of bad acts" existed. Coleman argues that Wexford has a policy limiting medical care based on cost. Pl.'s Resp. Br. at 8. Because of this cost-driven policy, Coleman claims that he was put on a waiting list for physical therapy and his treatment was unreasonably delayed. *Id.* To support this conclusion, Coleman cites to the deposition of his physical therapist, Jose Becerra. *Id.* Coleman argues that Becerra told him that Wexford drastically reduced the hours of physical therapy to cut costs, thereby causing delays. *Id.* Becerra's deposition testimony does not support this assertion. Becerra does testify that his weekly hours were reduced around 2004. R. 180-4, DSOF Exh. H, Becerra Dep. at 13:9-14:3. But when asked if the reduction in hours coincided with Wexford becoming the Stateville medical provider, Becerra testified "I believe so. As far as who decided . . . by how much to reduce us or if it correlated exactly with that, I really can't recall." *Id.* at 71:11-18. Becerra, who was not an employee of Wexford, *could not recall* whether the decision to reduce the hours came from Wexford or even coincided with Wexford's entry into the picture. This is not sufficient to create a genuine issue of fact as to the existence of a policy. Coleman also had alleged, at his deposition, that Dr. Carter and Dr. Saleh Obaisi, Wexford's new Medical Director, told him that Wexford refused to pay for certain treatments. Coleman Dep. at 117:22-118:10; 148:9-20. In his response to Defendants' statement of facts, Coleman apparently concedes that neither Dr.

Carter nor Dr. Obaisi made these statements. Pl.'s Resp. DSOF ¶¶ 46, 58. Coleman does not present any further evidence that a policy or series of bad acts occurred.

Coleman also makes further damaging admissions. In his response to Defendants' statement of facts, Coleman concedes that no cost-cutting policy existed. He admits that "Wexford does not deny medical treatment to inmates based on the cost . . . . Further, Wexford had no policies or procedures in place limiting the ability of Dr. Carter, or any other Wexford medical provider, to practice medicine or to prescribe medical treatment to an inmate that required such treatment." Pl.'s Resp. DSOF ¶¶ 46-47. He also admits that "Wexford does not make decisions on whether to provide patients with treatment based on cost." *Id.* ¶ 58. Due to Coleman's own admissions and his failure to present any admissible evidence that establishes a policy or series of bad acts, summary judgment must be granted in favor of Wexford.[6]

---

[6] The Defendants also moved for summary judgment on this issue of punitive damages. Defs.' Br. at 22. Because the Defendants are entitled to summary judgment on the deliberate indifference claim, the Court does not need to decide whether punitive damages are warranted.

## IV. Conclusion

For the reasons discussed above, the Defendants' motion for summary judgment is granted. As noted above, *see supra* 1 n.1, Defendant Godinez is also entitled to judgment in light of this decision in favor of the individual Defendants.

ENTERED:

      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 30, 2014